IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**FILED**

JAN 1 4 2008

LEO G. WOODHOUSE,
Plaintiff,

v.

Civil Action No. 5:06cv114
(Judge Stamp)

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,
Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381-1383f. The matter is awaiting decision on Plaintiff's Motion for Judgment on the Pleadings and Defendant's Motion for Summary Judgment, and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

### I. Procedural History

Leo G. Woodhouse ("Plaintiff") filed his application for SSI on November 19, 2003, alleging disability beginning April 16, 2003, due to mild scoliosis, severe arthritis, degenerative disc disease, bipolar disorder, and a learning disability (R. 54, 68). The application was denied initially and on reconsideration (R. 23, 30). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ")

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for former Commissioner Jo Anne B. Barnhart (or Acting Commissioner Linda L. McMahon [if the caption was changed previously]) as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. §405(g).

Richard Pietrowicz held on April 18, 2006 (R. 268). Plaintiff, represented by counsel, testified on his own behalf, along with Vocational Expert J. Herbert Pearis("VE"). By decision dated May 26, 2006, the ALJ denied benefits (R. 19). The Appeals Council denied Plaintiff's request for review on July 28, 2006 , rendering the ALJ's decision the final decision of the Commissioner (R. 6).

## II. Statement of Facts

Plaintiff was born on June 16, 1965, and was 40 years old at the time of the ALJ's decision (R. 19). He completed the tenth grade in regular classes, and took nurses' aide training (R. 74). He has worked in the past as a cashier (1989), a nurse's aide in a nursing home (1989-1990), a lumber handler (1990-1991), a manager of a produce market (1991-1993), a self-employed yard-care worker (1993-1996 and 1996-1997), and a construction laborer (four months in 1996) (R. 69).

On April 7, 2000, Plaintiff saw his family physician, William Browning, M.D., after having been in "the nervous hospital" (R. 239). He had been placed on Prozac and Depakote and Xanax. He was unable to afford the medications. He also had a cast on his right hand and wrist for reasons he did not explain to his doctor, but the doctor speculated he had "possibly a boxer's fracture." His doctor investigated getting his prescriptions through the indigent drug program, and was successful in getting Plaintiff a prescription for Depakote. There is no record of Plaintiff's actually having been in the "nervous hospital," but he explained to psychologist Judith Lucas in June 2004, as follows:

> The client stated that he went to Seneca Mental Health Center for "DUI School" He stated that he did this in Lewisburg and was also in counseling briefly in Marlington. He reported that he was at St. Joseph's in Elkins about three and one-half years ago. He stated that he had stopped drinking but then went out and got drunk. He stated that the next day after he had sobered up, he got violent and asked to go to St. Joseph's. He stated that he was in Weston in 1990 or 1991 because of alcohol abuse.

(R. 138).

On January 15, 2002, Plaintiff presented to Seneca Health Services regarding his alcohol

2

abuse in remission, cannabis abuse in remission, and bipolar disorder, mixed (R. 136). It was noted that he had started back to church and "things [were] looking up." He was not working. His back was "so-so," and he was getting depressed. He had restarted Prozac only a week earlier. His mood was better and he was sleeping better than usual. His relationship with his wife was better and he was less irritable. Upon mental status exam, Plaintiff was fully oriented, his affect was bright, and his mood was euthymic. He was diagnosed with alcohol dependence in remission, marijuana abuse in remission, and bipolar disorder, mixed.

Plaintiff returned to Seneca Health Services on April 2, 2002, as scheduled, for follow up (R. 136). His affect was still bright, his mood was still euthymic, and he was fully oriented. He reported that being back in church was helping. He was doing yard work- pick-up jobs. He was taking a home-study course on small motors. His sleep was ok, his irritability was ok, and his mood was ok. He was getting to see his sons. His diagnosis remained the same.

Plaintiff returned to Seneca for follow up on September 24, 2002 (R. 135). Plaintiff stated he was doing pretty well, although he was concerned about his automobile insurance, however. His sleep was variable, but his appetite was good. He said he just worried about things too much. He was working "as a handyman," mowing lawns, etc. Upon mental status exam, his speech was logical, coherent and goal-directed. His mood was depressed and his affect "blunted." His remote and recent memory were both good. He was diagnosed with bipolar disorder, alcohol dependence (sober 20 months) and cannabis abuse. He was continued on Depakote and Prozac.

Plaintiff alleges disability beginning April 16, 2003, due to "mild scoliosis, severe arthritis, degenerative disc disease, bipolar, learning disability" (R. 68).

On October 16, 2003, Plaintiff presented to the hospital for complaints of back pain (R. 137).

3

X-rays showed small anterior osteophytes in the thoracic and lumbar areas; old wedging of T11 and T12; mild reduction in the height of the L4-5 disc space consistent with some element of degenerative disc disease at that level; and shallow scoliosis on the left. The impression was degenerative changes, minor scoliosis, and degenerative disc disease.

On October 20, 2003, Plaintiff presented to William Browning, M.D., for complaints of severe lower back pain (R. 178). Plaintiff said he had hurt his back about two weeks earlier and had been in pain since. Dr. Browning noted that X-rays "only showed severe DJD." He also noted that Plaintiff was working as a laborer and was unable to do "his job." Upon examination, Plaintiff had tenderness in the lower lumbar spine with decreased range of motion. The pain did not radiate to his legs. Movement increased pain. Dr. Browning diagnosed lumbar sacral strain, gave Plaintiff samples of Vioxx and Flexeril, and advised him to rest and use moist heat. Dr. Browning noted: "He was also going to sign up for SSI. I agree with this."

On November 12, 2003, Plaintiff returned to Dr. Browning for follow up of his back pain (R. 178). He said he was doing better. He still had decreased range of motion. He was again diagnosed with lumbosacral strain. He had applied for SSI and was trying to get a medical card. His doctor wrote a "To Whom it May Concern" note, stating that Plaintiff was "disabled and cannot perform his regular duties" due to a diagnosis of "lumbar pain" (R. 236).

Plaintiff filed his application for SSI on November 19, 2003, alleging disability beginning April 16, 2003, due to mild scoliosis, severe arthritis, degenerative disc disease, bipolar disorder, and a learning disability.

On April 15, 2004, Plaintiff presented for a psychological evaluation, performed by Judith F. Lucas, MA (R. 181). Plaintiff stated he was unable to work due to crushed discs in his back. He

was currently doing odd jobs such as yard work for people, but only a couple of hours per day.

Upon Mental Status Examination, Plaintiff was clean and suitably dressed (R. 140). He was cooperative. He related appropriately with the examiner. His speech was relevant and coherent. He was fully oriented and exhibited no mood disturbance – he was cheerful. His affect was broad and his thought processes were logical and organized. He seemed to have fair insight and mildly deficient judgment. Immediate memory was within normal limits; recent memory was moderately deficient; and remote memory was fair. His concentration was moderately deficient. Upon testing, Plaintiff's IQ was in the 80's, he read at the 4th grade level, and performed math at the 6th grade level.

Plaintiff reported his daily activities consisted of sitting and watching television. If he felt good, he might go outside and walk around or work in the flower beds. He did repair work at home such as plumbing and carpentry. He visited friends occasionally and went to church weekly. He might do the laundry and vacuumed occasionally if it did not hurt his back too much. He got his child up in the morning and took her to school. He helped her with her homework. He went to school activities. He took his mother to work. He did odd jobs for people, and might rake for a couple of hours at home. He occasionally watched television in the evening.

The psychologist found Plaintiff's social functioning was within normal limits, and his persistence and pace were within normal limits. She diagnosed Depressive Disorder NOS ("based on the client's reporting. He did not appear to be depressed during the interview"); Alcohol Dependence in Sustained Full Remission; and Borderline Intellectual Functioning.

On April 24, 2004, a State Agency Medical Consultant completed a Physical Residual Functional Capacity Assessment ("RFC"), opining that Plaintiff could occasionally lift and carry 50 pounds, frequently lift and carry 25 pounds, walk/stand about six hours in an eight-hour workday,

and sit about six hours in an eight-hour workday (R. 144). He could occasionally perform all postural limitations. He should avoid concentrated exposure to vibration and hazards.

The reviewing physician opined that Plaintiff's symptoms were attributable to a medically determinable impairment, but that the severity or duration of the symptoms was disproportionate to the expected severity or duration on the basis of the medically determinable impairments. He commented that Plaintiff was a well-built young man with back pain allegations, which were "not well supported by physical evidence to make him not able to work for 3 years."

On May 18, 2004, a reviewing State agency psychologist completed a Mental Residual Functional Capacity Assessment of Plaintiff, finding him moderately limited in his ability to maintain attention and concentration for extended periods (R. 151). He was otherwise not significantly limited in any functional area. The psychologist also completed a Psychiatric Review Technique ("PRT") opining that Plaintiff's borderline intellectual functioning, depressive disorder, NOS, and substance addition disorder caused moderate difficulties in maintaining concentration, persistence or pace, but only mild restriction of activities of daily living and mild difficulties in maintaining social functioning (R. 165).

On June 24, 2004, Plaintiff presented to Rodolfo Gobunsuy, M.D., for a State Disability Determination Evaluation (R. 169). Plaintiff was on no medications. Upon physical examination, Plaintiff was 6'1" tall and weighed 162 pounds. His blood pressure was 102/60, and his vision was 20/20 without glasses. Plaintiff appeared comfortable sitting and supine. He walked steadily without limp or antalgia, and had no difficulty getting up from the sitting position. He was able to walk on his heels, toes, heel-to toe, and squat without difficulty. He could stand on one leg at a time. His spine curvature was normal. The lumbar spine was tender at L3-S1 with no muscle spasm. Straight leg raising was negative and reflexes were all normal. He had numbness of the arms off and

on and seemed to have carpal tunnel syndrome, but wrote his name and picked up a coin with no difficulty. His handgrip was 40 bilaterally.

On September 14, 2004, Plaintiff presented to Dr. Browning for a physical for the State agency (R. 177). There are no records from Dr. Browning in the record from November 2003, until this date. Plaintiff complained of very severe lower back pain radiating down his leg. He had not worked in the last year but had no insurance to get an evaluation or treatment. Upon examination, Plaintiff had tenderness in the lower back radiating into the left buttock. Straight leg raising was positive at 30 degrees bilaterally with severe back pain. There was slightly decreased sensation in the left thigh and foot. Psychologically, all seemed normal, with the exception of a reported history of bipolar disease. The doctor suggested Plaintiff go to Seneca because they had a sliding fee scale and he could get free medicine "but he seems reluctant to do that."

On October 7, 2004, Plaintiff was found by the State to be disabled by virtue of his lower back pain (R. 250). He received a medical card.

On October 27, 2004, Plaintiff followed up with Dr. Browning regarding his back (R. 176). He reported pain still at a level seven radiating from the mid back into the lower leg. He had received a medical card and wanted to have some tests done. He apparently was not taking his Depakote for his bipolar disease, but used it occasionally. His mood swings had not been as bad and he denied any depression or severe agitation. Pain kept him from working. On exam, he had tenderness in the left SI joint area, and decreased range of motion. He was diagnosed with bipolar disorder and left sacroiliitis. He was encouraged to take his Depakote.

A November 9, 2004, MRI of the lumbar spine indicated degenerative disc disease with disc space narrowing at L4-5 and L5-S1 and L1-2 (R. 215). There was mild disc herniation at L5-S1 and

left sided mild disc herniation at L4-5.

On December 27, 2004, Plaintiff underwent a consultative psychological evaluation, performed by Tina Wagner, M.S., at the request of the State agency (R. 179). Plaintiff was living with his wife and their two children at his mother's home. Plaintiff was cooperative and his attitude was serious. He drove himself to the evaluation, and was accompanied by his wife and infant daughter. He had a driver's license. Plaintiff stated he was applying for benefits because he had "a lot of pain." He said he had been unable to do anything for the past year and a half.

Plaintiff reported feeling down and sad over the fact that he was not able to support his family and children. He also reported difficulty sleeping, fluctuating appetite, low energy and fatigue, and a great deal of physical problems including arthritis in his hip joint, migraines, degenerative disc disease and mild scoliosis. He reported being diagnosed with bipolar disorder and a learning disability, and reported episodes of mania approximately once or twice every other month.

Ms. Wagner reviewed an evaluation on November 2001, diagnosing Alcohol Dependence in full sustained remission; Cannabis Abuse; and Bipolar I Disorder, most recent mixed. Another evaluation in July 2000, showed diagnoses of Alcohol Dependence and a Disorder of Written Expression as well as Bipolar I Disorder, most recent episode mixed. Finally, in April 2004, an evaluation indicated diagnoses of Depressive Disorder, NOS, Alcohol Dependence in sustained full remission, and Borderline Intellectual Functioning.

Plaintiff reported taking his medications "only sporadically," despite having received a medical card. He was prescribed Ultracet, Flexeril, and Vioxx. He had been prescribed Hydrocodone in the past, but it upset his stomach too badly. He chewed one box of tobacco per day and drank three to four pots of coffee per day. He said he had not had alcohol in five years.

Upon Mental Status Examination, Plaintiff was appropriately dressed and well groomed. He appeared motivated. His speech was normal, clear, and concise. He was fully oriented. His mood was euthymic, his affect broad, his stream of thought and thought content were within normal limits. His insight was fair and his psychomotor behavior appeared mildly retarded. He had straight posture and normal gait. His judgment appeared within normal limits, as did his immediate memory. His recent and remote memory appeared moderately deficient. His concentration was mildly deficient, his persistence was normal, and his pace was mildly slow.

Plaintiff's social functioning appeared normal during the evaluation. He made good eye contact and displayed a sense of humor. Plaintiff, however, reported it was very difficult for him to be around people. He had one set of friends he visited occasionally. He went to church, tried to go outside and walk daily, drove his wife to the grocery store, but did not go in because he did not want to be around crowds. Plaintiff's wife told the psychologist that Plaintiff had no patience and became irritable quite quickly. He also had a problem with forgetfulness.

Plaintiff reported a typical day as waking up at 6:30 am and drinking several pots of coffee, and taking the children to school and his mother to work (R. 183). He reported he was unable to do chores like he used to. His wife typically took care of the laundry, dishes, cooking, cleaning, and shopping. Plaintiff helped out with childcare and could maintain his own activities of daily living. He tried to help as needed, but was unable to do much work. He was unable to climb and could only mow grass on a riding lawnmower, and even then the lawnmower put stress on his back. Most of his day was spent sitting around the house, watching television and "doing childcare."

Ms. Wagner diagnosed Plaintiff with Bipolar I Disorder, most recent episode, mixed, mild; Alcohol Dependence in full-sustained remission; and Borderline Intellectual Functioning. His

prognosis was Fair (R. 183).

On March 2, 2005, May Wirts, a State agency reviewing physician, completed an RFC, finding Plaintiff could occasionally lift/carry 50 pounds and frequently lift/carry 25 pounds (R. 186). He could stand/walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday. He could occasionally perform all postural limitations, and should avoid concentrated exposure to extreme cold, vibration, and hazards.

Doctor Wirts noted:

Claimant has degenerative arthritis with DDD and osteophytes of the thoracic and lumbar spine. He has minor scoliosis and migraine headaches. He uses a heating pad and over the counter medications for pain. Claimant is partially credible and partially supported. Severity of allegations are not consistent with evidence in file and self reported ADLs. RFC is limited to medium with occasional postural limitations and consistent with ADLs/he does child and pet care, vacuums, does laundry, gets the mail, takes out trash, drives and shops. He can still work on small motors and wood working. He can lift 40 pounds.

(R. 192).

On March 5, 2005, State agency reviewing psychiatrist James Binder, MD, completed a Mental RFC and PRT, opining that Plaintiff would be moderately limited in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with co-workers or peers without distracting them or exhibiting behavioral extremes. He was otherwise not significantly limited.

Dr. Binder noted he considered Plaintiff credible, but opined he appeared capable of performing basic work-like tasks. His ADLs seemed limited more due to pain and he was currently not in any mental health treatment. He had worked successfully in the past with his mental conditions. Dr. Binder found Plaintiff had diagnoses of bipolar disorder, borderline intellectual

functioning, and alcohol dependence in full remission, and found he would have mild restriction of activities of daily living, moderate difficulties in maintaining social functioning and maintaining concentration, persistence or pace, and had never had an episode of decompensation.

On May 5, 2005, neurosurgeon Larry Carson M.D., to whom Plaintiff was referred by Dr. Browning, wrote to Dr. Browning regarding Defendant's back and leg pain (R. 212). Dr. Carson stated that on physical examination, Plaintiff's appearance was well-developed and well-nourished in no apparent distress. His gait and station were smooth and steady. He had full strength bilaterally. He had no spasm. Sensation was decreased in both feet. Deep tendon reflexes were decreased. He had negative clonus and negative straight leg raising. Dr. Carson did not feel Plaintiff would require surgery at this point, and felt he would benefit from physical therapy, nonsteroidal anti-inflammatory medication, epidural injections, and training in lifting and good back hygiene.

On June 1 2005, Plaintiff began physical therapy for his back impairment at Seneca Trail Physical Therapy (R. 217). He also began a series of steroid injections on June 2, 2005 (R. 224). He felt better following his initial treatment (R. 218).

On June 8, 2005, one week after he began physical therapy, Plaintiff said he was sore due to "digging a ditch" (R. 218).

On June 10, 2005, two days later, Plaintiff said he felt pretty good, but "hasn't had much work since last visit."

On June 15, 2005, Plaintiff said his back felt better most of the time, but if he was "digging or carrying much," his pain was pretty severe later that day (R. 219). He continued to do well through June (R. 220). He reported very little back pain, which only increased due to riding a mower all day on one occasion. He reported he was "much improved" due to physical therapy. He was

11

"only able to work about 1-2 hours prior, now able to work 5-6 hours before back starts hurting."

In April 2006,[2] Dr. Browning completed a questionnaire, stating he was Plaintiff's family physician, seeing him mostly for back pain (R. 255). There are no records in the transcript for Dr. Browning since November 2004, about 1 ½ years earlier. Dr. Browning opined that Plaintiff was not a malingerer, and his pain medications occasionally caused nausea and drowsiness. He opined that Plaintiff's pain was severe enough to frequently interfere with attention and concentration, and that he was incapable of tolerating even low stress. He could sit for about 30 minutes at a time and stand for about 30 minutes at a time; however, he could only sit for two hours and stand for two hours total in an eight hour work day. He would need to take unscheduled breaks during the day, every 15-20 minutes, lasting 15 minutes at a time. He must use a cane or other assistive device even for occasional standing/walking. Dr. Browning also opined Plaintiff could occasionally lift/carry only ten pounds or less; could never twist or climb ladders, and could only occasionally stoop, crouch or climb stairs. He would also have significant limitations in repetitive reaching, handling or fingering. Dr. Browning noted that Plaintiff had bipolar disorder that was not well controlled on Depakote and must therefore limit the stress in his life. Noise made him more irritable.

The ALJ restricted Plaintiff to light work with no need for frequent social interchange, doing simple repetitive tasks, avoiding concentrated hazards, concentrated vibration, and cold, and with no frequent bending (R. 311). The VE testified that Plaintiff could not do any of his previous jobs, but that there were other jobs that existed in significant numbers that Plaintiff could perform. Plaintiff's counsel then asked the VE to add to the hypothetical psychiatrist Binder's findings that

---

[2]Plaintiff mistakenly refers to this record as from April 2005. See Plaintiff's Memorandum at page 4.

Plaintiff would be moderately limited in his ability to understand, remember, and carry out detailed instructions; moderately limited in the ability to maintain attention and concentration for extended periods, moderately limited in the ability to interact appropriately with the general public; and moderately limited in the ability to accept and respond to supervision, to which the VE responded:

A     That'll be fine. With the jobs that we have suggested there, they're unskilled. They are simple, routine jobs, and for the most part, very little or absolutely no contacts with the - - I won't say absolutely none. But almost no contact with the general public at all. Moderately limited to get along with a supervisor and coworkers is one of those - - certainly a gray area. But I would think that with the kinds of work that he was doing there, that he could probably do those.

Q     And the ability - - the difficulties in accepting supervision - -

A     Again, we're talking about pretty simple, routine jobs. And the necessity for significant supervision, I think, would be somewhat limited there.

Q     Okay, would you agree with me that if a person, in those kinds of jobs that you've cited there, in both one and four, if the person had a sit/stand option and had to take frequent breaks because of pain, to adjust themselves, that that would impact those kind of simple jobs?

A     Sure, it could. If the person has to take breaks and - - these are the kinds of jobs that could be done - - let me just make sure. I don't want to - - yeah, these are the kinds of jobs that you could sit or stand - - I'm not going to say at will, but a good part of the time. The problem though is that if, according to his testimony, that he had to get up and shake his legs and move a little bit, then that would take him away from the job or that would prevent him from doing his job. And that certainly would impact it.

Q     And those are the kind of jobs - -

A     Yeah.

Q     - - that you're really have to be - -

A     Yeah, you're - - they're the kind of jobs in which you're expected to perform. Now, you're not - - they're not so routine that you can do them in your sleep, but at the same time, they are pretty routine. But you are expected to do them on a sustained basis.

Q     Okay, let me just ask you one other thing that I'm concerned with. Wouldn't those be the kind of jobs where you just take orders from supervisors? You pretty well don't mouth off

in those unskilled kind of jobs, right?

A      Well, these are the kind of jobs that are basically routine, that the - - are so routine that your daily routine is normally laid out for you. And there's not a great deal of deviation from this. You're not having to adjust to a new situation, so I don't think it's - - as I've tried to indicate earlier, where a great deal of supervision is required. It is more of a situation in which he needs to perform, and of the things that you cite that have significance, it would be the need to be away from the job to get yourself into position to go back on his own. That's the one that would cause the most difficulty.

(R. 320-321)(emphasis added).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 416.920(b) and 416.971 *et seq.*).

2. The claimant has severe back and mental impairments as established by appropriate and credible medical and other relevant evidence as set out below (20 CFR § 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the Administrative Law Judge finds that the claimant has the residual functional capacity to perform a range of work attested to by the vocational expert in the first of a series of hypothetical questions.

5. The claimant is unable to perform his past relevant work that was medium to heavy in exertional levels (20 CFR 416.965).

6. The claimant was born on June 16, 1965 and was 38 years old on the alleged disability onset date, which is defined as a younger individual 18-44 (20 CFR § 416.963).

7. The claimant has a " limited education" and is able to communicate in English (20 CFR § 416.964).

8. Transferability of job skills is not an issue in this case because the claimant's past

relevant work is unskilled (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).

10. The claimant has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision. (20 CFR § 416.920(g)).

(R. 18-19).

## IV. The Parties' Contentions

Plaintiff contends:

1. The Commissioner erred in discounting Mr. Woodhouse's testimony concerning the intensity, duration and limiting effects of his symptoms of pain;

2. The Commissioner erred as a matter of law in rejecting the opinion and assessment of Mr. Woodhouse's treating physician; and

3. The Commissioner erred in improperly relying upon the vocational expert's responses to an incomplete hypothetical question.

Defendant contends:

1. Substantial evidence supports the ALJ's finding that Plaintiff could perform the limited range of light work identified by the Vocational Expert.

## V. Discussion
## A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated

substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984)(<u>quoting</u> <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Pain and Credibility

Plaintiff first argues that the Commissioner erred in discounting his testimony concerning the intensity, duration and limiting effects of his symptoms of pain. The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir.1984) (<u>citing</u> <u>Tyler v. Weinberger</u>, 409 F.Supp. 776 (E.D.Va.1976)).

The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in <u>Craig v. Chater</u>, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed,

*that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated, See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, supra at 594. Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce the symptoms he alleged, but not to the extent alleged. The ALJ therefore found plaintiff passed the Step One– threshold test. He was therefore required to go on to Step Two of the pain and credibility evaluation, taking into account "not only the claimant's statements about []pain, but also all the available evidence, including the claimant's medical history, medical signs, and laboratory findings . . . . any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.) . . . . and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it." Here a review of the decision shows the ALJ discussed Plaintiff's statements about his pain, his medical history, medical signs, and laboratory findings, objective medical evidence of pain, specific descriptions of the pain, medical treatment taken to alleviate the pain, and Plaintiff's daily activities.

In particular the ALJ relied on Plaintiff's own reported activities, such as performing odd jobs for people, doing repair work at home, doing yard work, taking his daughter to school and his mother to work, helping his daughter with her homework, and mowing the lawn with a riding lawnmower. Plaintiff filed for disability in November 2003. Yet on April 15, 2004, when Plaintiff

stated he was unable to work due to crushed discs in his back, he was currently doing odd jobs such as yard work for people, if only for a couple of hours per day. He said that if he felt good, he might go outside and walk around or work in the flower beds. He did repair work at home such as plumbing and carpentry. He visited friends occasionally and went to church weekly. He might do the laundry and vacuumed occasionally if it did not hurt his back too much. He got his child up in the morning and took her to school. He helped her with her homework. He went to school activities. He took his mother to work. He did odd jobs for people, and might rake for a couple of hours at home. He occasionally watched television in the evening.

In December 2004, Plaintiff reported his activities as waking up at 6:30 am and drinking several pots of coffee, and taking the children to school and his mother to work (R. 183). He reported he was unable to do chores like he used to. His wife typically took care of the laundry, dishes, cooking, cleaning, and shopping. Plaintiff helped out with childcare and could maintain his own activities of daily living. He tried to help as needed, but was unable to do much work. He was unable to climb and could only mow grass on a riding lawnmower, and even then the lawnmower put stress on his back. Most of his day was spent sitting around the house, watching television and doing childcare.

Most significant, however, are Plaintiff's own statements to his physical therapist. On June 1 2005, Plaintiff began physical therapy for his back impairment (R. 217). He also began a series of steroid injections(R. 224). He felt better following his initial treatment (R. 218), and continued to feel "pretty good" for a week, until June 8, 2005, only one week after he began physical therapy, when Plaintiff said he was sore due to digging a ditch (R. 218). Two days later he said he felt pretty good, but "hasn't had much work since last visit." (Emphasis added).

18

On June 15, 2005, Plaintiff said his back <u>felt better most of the time, but if he was "digging</u> <u>or carrying much," his pain was pretty severe later that day</u> (R. 219) (emphasis added). He continued to do well through June (R. 220). He reported very little back pain, which only increased due to riding a mower <u>all day</u> on one occasion. He reported he was "much improved" due to physical therapy. While he was "<u>only able to work about 1-2 hours prior, [he was] now able to work 5-6</u> <u>hours before [his] back starts hurting</u>." (Emphasis added).

These statements from Plaintiff himself indicate he was able to perform fairly heavy work, if not on a sustained eight-hour a day basis, at least up to 5-6 hours at a time. That work is totally inconsistent with Plaintiff's other statements that he had not been able to do anything for the last one and a half years because of his pain, and supports the ALJ's determination that he could work at a limited light level.

Plaintiff's complaints of pain and limitation were also inconsistent with his examination by Rodolfo Gobunsuy, M.D. (R. 169). While true that Dr. Gobunsuy was an examining, not a treating, physician, it is clear that Plaintiff was on no medications, yet he appeared comfortable sitting and supine. He walked steadily without limp or antalgia, and had no difficultly getting up from the sitting position. He was able to walk on his heels, toes, heel-to toe, and squat without difficulty. He could stand on one leg at a time. His spine curvature was normal. The lumbar spine was tender at L3-S1 with no muscle spasm. Straight leg raising was negative and reflexes were all normal. He had numbness of the arms off and on and seemed to have carpal tunnel syndrome, but wrote his name and picked up a coin with no difficulty. His handgrip was 40 bilaterally.

State agency reviewing physician Wirts also found Plaintiff not entirely credible, especially noting that Plaintiff's allegations were not consistent with evidence in file and his "<u>self reported</u>

ADLs." (Emphasis added). As did the ALJ, Dr. Wirts noted Plaintiff performed pet and child care, vacuumed, did laundry, got the mail, took out the trash, drove, and shopped, and still worked on small motors and wood working. She limited his RFC to medium with occasional postural limitations.

Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)). For reasons set forth above, the undersigned finds substantial evidence supports the ALJ's determination that Defendant's allegations of pain and limitation were not entirely credible.

### C. Treating Physician's Opinion

Plaintiff next argues the Commissioner erred as a matter of law in rejecting the opinion and assessment of his treating physician, Dr. Browning. Although Dr. Browning was Plaintiff's treating physician, the undersigned does not find his opinion should be accorded the weight usually due a treating physician. According to the record, Plaintiff saw Dr. Browning in August 1999 for something in his eye. He next saw him in February 2000, for an upper respiratory infection. Two months later, he presented with diarrhea and gastroenteritis. In August 2000, he saw Dr. Browning for a broken hand and mental problems. In January 2001, he presented with sinusitis, and in April 2001, for something in his eye.

On October 20, 2003, Plaintiff presented to Dr. Browning for complaints of severe lower back pain (R. 178). Plaintiff said he had hurt his back about two weeks earlier and been in pain since. X-rays, according to his own doctor, showed showed "only" severe DJD. Dr. Browning opined only that Plaintiff was working as a laborer and was unable to do "his job." Upon

examination, Plaintiff had tenderness in the lower lumbar spine with decreased range of motion. The diagnosis was lumbar sacral strain. Dr. Browning advised rest and moist heat, and gave Plaintiff samples of Vioxx and Flexeril. The doctor noted: "He was also going to sign up for SSI. I agree with this." In other words, having not seen Plaintiff for more than two years, Dr. Browning was opining that Plaintiff should sign up for SSI. This opinion was apparently based on one examination and x-rays showing "only" severe DJD, and after only two weeks of back pain.

On November 12, 2003, Plaintiff returned to Dr. Browning for follow up of his back pain (R. 178). He said he was doing better. He still had decreased range of motion. He was again diagnosed with lumbosacral strain. He had applied for SSI and was trying to get a medical card. His doctor wrote a "To Whom it May Concern" note, stating that Plaintiff was disabled and unable to perform his regular duties, with a diagnosis of lumbar pain (R. 236). First, this opinion came after two visits and after only about five weeks of reported back pain. Second, the opinion expressly states Plaintiff could not perform his "regular duties," meaning his laborer jobs.

On September 14, 2004, nearly a year later, and with no recorded visits in between, Plaintiff presented to Dr. Browning for a physical for the State agency (R. 177). He complained of very severe lower back pain, now radiating down his leg. He had not worked in the last year but had had no insurance to get an evaluation or treatment. Upon examination, Dr. Browning found Plaintiff had tenderness in the lower back radiating into the left buttock. Straight leg raising was positive at 30 degrees bilaterally with severe back pain. There was slightly decreased sensation in the left thigh and foot. Psychologically, Plaintiff seemed normal, with the exception of a reported history of bipolar disease. The doctor suggested Plaintiff go to Seneca Mental Health because they had a sliding fee scale and he could get free medicine but he "seemed reluctant" to do that. Plaintiff

received a medical card after this exam.

On October 27, 2004, Plaintiff followed up with Dr. Browning regarding his back (R. 176). He reported pain still at a level seven radiating from the mid back into the lower leg. He had received a medical card and wanted to have some tests done. He apparently was not taking his Depakote for his bipolar disease, but used it occasionally. His mood swings had not been as bad and he denied any depression or severe agitation. Pain kept him from working. On exam, he had tenderness in the left SI joint area, and decreased range of motion. He was diagnosed with bipolar disorder and left sacroiliitis. He was encouraged to take his Depakote.

A November 9, 2004, MRI of the lumbar spine indicated degenerative disc disease with disc space narrowing at L4-5 and L5-S1 and L1-2 (R. 215). There was mild disc herniation at L5-S1 and left sided mild disc herniation at L4-5.

On May 5, 2005, neurosurgeon Larry Carson M.D. wrote to Dr. Browning regarding Defendant's back and leg pain (R. 212). Dr. Carson stated that on physical examination, Plaintiff's appearance was well-developed and well-nourished in no apparent distress. His gait and station were smooth and steady. He had full strength bilaterally. He had no spasm. Sensation was decreased in both feet. Deep tendon reflexes were decreased. He had negative clonus and negative straight leg raising. Dr. Carson did not feel Plaintiff would require surgery at this point, and felt he would benefit from physical therapy, nonsteroidal anti-inflammatory medication, epidural injections, and training in lifting and good back hygiene.

Plaintiff, in fact, did benefit from physical therapy, which he began on June 1 2005, along with a series of steroid injections. He felt better following his initial treatment (R. 218), and continued to feel "pretty good" for a week, until June 8, 2005, only one week after he began physical

therapy, when he said he was sore <u>due to digging a ditch</u> (R. 218). Two days later he said he felt pretty good, but "<u>hasn't had much work since last visit</u>." (Emphasis added).

On June 15, 2005, Plaintiff said his back <u>felt better most of the time, but if he was "digging or carrying much," his pain was pretty severe later that day</u> (R. 219) (emphasis added). He continued to do well through June (R. 220). He reported <u>very little back pain</u>, which only increased due to riding a mower <u>all day</u> on one occasion. He reported he was "much improved" due to physical therapy. While he was "<u>only able to work about 1-2 hours prior, [he was] now able to work 5-6 hours before [his] back starts hurting</u>." (Emphasis added).

In April 2006, nearly a year later, and more than two years since his last recorded visit to Dr. Browning, Dr. Browning completed a questionnaire, stating he was Plaintiff's family physician, seeing him mostly for back pain (R. 255). He opined that Plaintiff was not a malingerer, and his pain medications occasionally caused nausea and drowsiness. He opined that the pain was severe enough to frequently interfere with attention and concentration, and that he was incapable of tolerating even low stress. He could sit for about 30 minutes at a time and stand for about 30 minutes at a time; however, he could only sit for two hours and stand for two hours total in an eight hour work day. He would need to take unscheduled breaks during the day, every 15-20 minutes, lasting 15 minutes at a time. He must use a cane or other assistive device even for occasional standing/walking. Dr. Browning also opined Plaintiff could occasionally lift/carry only ten pounds or less; could never twist or climb ladders, and could only occasionally stoop, crouch or climb stairs. He would also have significant limitations in repetitive reaching, handling or fingering. Dr. Browning noted that Plaintiff had bipolar disorder that was not well controlled on Depakote and must therefore limit the stress in his life. Noise made him more irritable.

The Fourth Circuit has held:

Circuit precedent does not require that a treating physician's testimony "be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

> [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight. The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983).

Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996).

In addition, 20 C.F.R. § 404.1527 (d) states, in pertinent part:

> (2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.
>
> > (I) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical

opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability*. The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

(4) *Consistency*. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

Here, according to the evidence of record before the ALJ, Dr. Browning's opinion was not based on "a continuing observation of [Plaintiff's] condition over a prolonged period of time." In fact, he opined Plaintiff was disabled after only two office visits, and after Plaintiff himself reported pain for only a little over a month. His 2006 opinion appears to come after no visits in more than two years, and after Plaintiff admittedly worked at jobs requiring manual labor for 5-6 hours a day in 2005. Plaintiff may argue, and the ALJ noted, that these jobs may not have constituted substantial gainful work activity ("SGA"); however, they are evidence of an ability to perform work at least at the light exertional level, as determined by the ALJ.

For all the above reasons, the undersigned does not find that Dr. Browning's opinion should be treated as that of a treating physician for the purposes of determining Social Security Disability. It is noted that Plaintiff may have been unable to see a physician regularly prior to 2004, but even

after he received his medical card he still took his medications sporadically, and did not see any physician regularly.

Further, Dr. Browning's opinion that Plaintiff was disabled is not supported by the evidence, and is inconsistent with the record as a whole. First, no other doctor opined that Plaintiff was disabled. Dr. Gobunsuy, an examining physician, noted that Plaintiff walked steadily without limp or antalgia; had no difficulty getting up from the sitting position; could walk on his heels, toes, heel-to-toe, and squat without difficulty; and could stand on one leg at a time. His straight leg raising was negative and reflexes were all normal, all in spite of his not taking any medications.

Additionally, State agency reviewing physician Wirts opined that Plaintiff could work at the medium exertional level. Dr. Wirts expressly found the severity of Plaintiff's allegations were not consistent with the evidence or with Plaintiff's own self-reported activities of daily living. 20 CFR § 404.1527(f)(2)(I) provides:

> Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence, except for the ultimate determination about whether you are disabled.

Additionally, Dr. Carson, a neurosurgeon who examined Plaintiff at the request of his treating physician, found Plaintiff's gait and station smooth and steady; full strength bilaterally; no spasm; and negative straight leg raising. He felt Plaintiff did not require surgery, and would benefit from physical therapy, non-steroidal medication, epidural injections, and training in lifting and good back hygiene. Plaintiff did, in fact, benefit from the treatment Dr. Carson suggested, except when he performed heavy manual labor such as "digging a ditch," or "carrying much." He reported being

"much improved' after only a short time of physical therapy, and reported being able to work 5-6 hours before his back started hurting, after "only" having been able to do such physical labor for 1-2 hours before physical therapy.

The undersigned finds all this evidence is inconsistent with Dr. Browning's opinion that Plaintiff was disabled in September 2004, and his RFC of April, 2006.

There is also the issue of the "disputed" diagnosis of herniated discs. In this case there was one MRI – in November 2004. According to the doctor who originally read the MRI, David C. Maki, D.O., it showed disc herniations at L4-5 and L5-S1 with degenerative disc disease. This very same MRI was reviewed by neurologist Dr. Carson six months later, who found it indicated "diffuse disk bulging more on the left at L4-L5, without significant nerve root compression." The ALJ noted this inconsistency, stating: "A MRI of the lumbar spine on November 9, 2004, revealed disc herniations (two) with degenerative disc disease . . . . A review of the November 2005 MRI [during a neurological consultation on May 5, 2005] resulted in a different conclusion of "bulging" disk without significant nerve root compression." The ALJ is responsible for resolving conflicts such as this one. In Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990), the Fourth Circuit stated:

> Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence. *King v. Califano*, 599 F.2d 597, 599 (4th Cir.1979) ("This Court does not find facts or try the case *de novo* when reviewing disability determinations."); *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir.1976) ("We note that it is the responsibility of the Secretary and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of nonpersuasion."); *Blalock v. Richardson*, 483 F.2d at 775 ("[T]he language of § 205(g) precludes a *de novo* judicial proceeding and requires that the court uphold the Secretary's decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.' ").

It was therefore the ALJ's duty to resolve the conflict regarding the MRI. He did not substitute his own opinion for the physicians'. For all the above reasons, the undersigned finds

substantial evidence supports the ALJ's treatment of Dr. Browning's opinion.

## D. ALJ's Hypothetical to the VE

Plaintiff lastly argues that the Commissioner erred in improperly relying upon the vocational expert's responses to an incomplete hypothetical question. The ALJ asked the VE the following hypothetical, upon which he relied in his ultimate Decision: "Light work with no need for frequent social interchange, simple repetitive tasks. Avoid concentrated hazards, concentrated vibration, and cold. No frequent bending." The VE responded that there would be a significant number of jobs that the hypothetical individual could perform.

Plaintiff first argues that the RFC on which the ALJ relied left out any limitations in Plaintiff's ability to sit or stand in one position for long periods of time and the need to adjust his position or take frequent unscheduled breaks. In <u>Koonce v. Apfel</u>, 166 F.3d 1209 (4th Cir 1999), the Court held that an ALJ has "great latitude in posing hypothetical questions" and need only include limitations that are supported by substantial evidence in the record. If the ALJ poses a hypothetical question that accurately reflects all of the claimant's limitations, the VE's response thereto is binding on the Commissioner. <u>Edwards v. Bowen</u>, 672 F. Supp. 230, 235 (E.D.N.C. 1987). The reviewing court shall consider whether the hypothetical question "could be viewed as presenting those impairments the claimant alleges." <u>English v. Shalala</u>, 10 F.3d 1080, 1085 (4th Cir. 1993).

Plaintiff is correct that the ALJ's hypothetical did not include a limitation on sitting or standing in one position for a long period of time and the need to adjust position or take unscheduled breaks. The undersigned finds that the evidence of record before the ALJ substantially supports his hypothetical. One State Agency Medical Consultant opined that Plaintiff could walk/stand about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday (R. 144). He also opined that the severity or duration of Plaintiff's symptoms was disproportionate to the expected

28

severity or duration on the basis of the medically determinable impairments. He commented that Plaintiff was a well-built young man with back pain allegations, which were "not well supported by physical evidence to make him not able to work for 3 years."

Dr. Gobunsuy opined that Plaintiff appeared comfortable sitting and supine. He walked steadily without limp or antalgia, and had no difficulty getting up from the sitting position. He was able to walk on his heels, toes, heel-to toe, and squat without difficulty. He could stand on one leg at a time. His spine curvature was normal. His lumbar spine was tender at L3-S1 but with no muscle spasm. Straight leg raising was negative and reflexes were all normal.

A second State agency reviewing physician opined that Plaintiff could stand/walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday. She also opined that Plaintiff's symptoms were not consistent with the evidence or with his own self-reported activities of daily living.

Further, even if he did require a sit/stand option or the ability to change positions, the VE actually testified that the jobs he named did include a sit/stand option. Therefore, even if the ALJ had erred by omitting this limitation, the error was not reversible, because the VE's testimony supported the ALJ's determination that Plaintiff could perform substantial work in the economy.

Plaintiff's counsel also argues:

> The ALJ did not fully address the implications of Mr. Woodhouse's psychiatric impairments in his questioning of the VE. He did not include the fact that Mr. Woodhouse is of borderline intelligence and has moderate difficulty with concentration . . . . This inability to concentrate would also clearly impact his ability to perform repetitive work on a sustained basis. As noted in counsel for Mr. Woodhouse's other questions to the VE, Dr. Binder also found moderate limitations in his ability to understand and remember and carry out detailed instructions, accept instructions, respond appropriately to criticism from supervisors, and get along with coworkers without distracting them or exhibiting behavioral extremes.

(Plaintiff's Memorandum at 14-15). The ALJ did, however, include in his hypothetical that the jobs

involve doing simple, repetitive tasks with no need for frequent social interchange. Additionally, as the VE noted, Plaintiff did actually had performed both skilled and unskilled work despite his borderline intelligence. Further, when Plaintiff's counsel asked the VE to add Dr. Binder's findings that Plaintiff would be moderately limited in his ability to understand, remember, and carry out detailed instructions; moderately limited in the ability to maintain attention and concentration for extended periods, moderately limited in the ability to interact appropriately with the general public; and moderately limited in the ability to accept and respond to supervision, the VE responded:

> A That'll be fine. With the jobs that we have suggested there, they're unskilled. They are simple, routine jobs, and for the most part, very little or absolutely no contacts with the - - I won't say absolutely none. But almost no contact with the general public at all. Moderately limited to get along with a supervisor and coworkers is one of those - - certainly a gray area. But I would think that with the kinds of work that he was doing there, that he could probably do those.

> Q And the ability - - the difficulties in accepting supervision - -

> A Again, we're talking about pretty simple, routine jobs. And the necessity for significant supervision, I think, would be somewhat limited there.

> . . . .

> A [T]hey're the kind of jobs in which you're expected to perform. Now, you're not - - they're not so routine that you can do them in your sleep, but at the same time, they are pretty routine. But you are expected to do them on a sustained basis.

> Q Okay, let me just ask you one other thing that I'm concerned with. Wouldn't those be the kind of jobs where you just take orders from supervisors? You pretty well don't mouth off in those unskilled kind of jobs, right?

> A Well, these are the kind of jobs that are basically routine, that the - - are so routine that your daily routine is normally laid out for you. And there's not a great deal of deviation from this. You're not having to adjust to a new situation, so I don't think it's - - as I've tried to indicate earlier, where a great deal of supervision is required. It is more of a situation in which he needs to perform, and of the things that you cite that have significance, it would be the need to be away from the job to get yourself into position to go back on his

own. That's the one that would cause the most difficulty.

(R. 320-321)(emphasis added).

The undersigned finds the ALJ included all the limitations that were supported by the record. Additionally, in the alternative, the VE's testimony substantially supports the ALJ's determination that there were a substantial amount of jobs in the national economy that Plaintiff could perform even if he had those limitations.

For all the above reasons the undersigned United States Magistrate Judge finds that substantial evidence supports the ALJ's conclusion that Plaintiff was not disabled, as defined in the Social Security Act.

### RECOMMENDATION

For the reasons above stated, I find that substantial evidence supports the Commissioner's decision denying Plaintiff's application for Supplemental Security Income. I accordingly respectfully **RECOMMEND** Plaintiff's Motion for Judgment on the Pleadings [Docket Entry 12] be **DENIED**; Defendant's Motion for Summary Judgment [Docket Entry 16] be **GRANTED,** and this matter be dismissed and stricken from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984),

cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

DATED: January _14_, 2008

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE